UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DONALD KISSINGER, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-CV-126 JD |
| | ) | |
| FORT WAYNE COMMUNITY | ) | |
| SCHOOLS, CITY OF FORT WAYNE, | ) | |
| GRADLIN PRUITT, BARRY PRUSER, | ) | |
| and DARRELL ARMSTEAD, | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

At the start of his senior year at L.C. Ward Education Center ("Ward"), Plaintiff Donald

Kissinger, Jr. ("Kissinger"), applied for special permission to drive to school. He did not

complete the necessary application process prior to the start of the academic year, but

nonetheless began driving himself and other students to and from school, in violation of Ward's

rules. School authorities confronted Kissinger about his noncompliance on August 26, 2015.

Based on his responses to their questions, they suspected he had drugs in his car, which on that

day was parked off school grounds, about one block away. A school official and a Fort Wayne

police officer accompanied Kissinger to his car, where a search of the vehicle produced a

marijuana pipe and burnt marijuana residue. The police officer handcuffed Kissinger and placed

him under arrest. Kissinger subsequently agreed to attend another school for the semester in lieu

of expulsion.

Kissinger filed this action against Fort Wayne Community Schools ("FWCS") under 42

U.S.C. § 1983 for maintaining an unconstitutional policy in violation of the Fourth Amendment's

protection against unreasonable searches and seizures. He also brings individual claims against

Gradlin Pruitt (Ward's principal), Darrel Armstead (Ward's administrative assistant), and Officer Barry Pruser of the Fort Wayne Police Department (Ward's school resource officer), for subjecting him to an unreasonable search and seizure in violation of the Fourth Amendment. Kissinger also asserted claims against those individuals under 42 U.S.C. §§ 1985(3) and 1986, but he has since voluntarily dismissed those claims along with a separate Fourteenth Amendment claim against FWCS and Pruitt. [DE 49 at 1] Lastly, Kissinger brings state law claims against all Defendants for false arrest and false imprisonment.

Defendants have moved for summary judgment and the motions are ripe for review. For the reasons stated herein, the Court will grant Defendants' motions for summary judgment [DE 45; DE 47] with regard to Kissinger's federal claims, and will dismiss Kissinger's state law claims without prejudice. The Court will further deny Defendants' motions to strike [DE 51; DE 54] as moot.

**STANDARD OF REVIEW**

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court

must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

## FACTUAL BACKGROUND

*Ward and Its Policies*

Ward (a public school) differs from other schools within the FWCS system because it is an "alternative placement school." As such, Ward provides an alternative learning environment for "middle and high school students who have been removed from their regular schools for significant rule violations involving drugs, weapons, fighting, and the like." [Pruitt Decl. ¶ 2] Drug possession and/or use counts as one of the most common rule violations. *Id.*

Due to its nature as an alternative school and its students' histories of "significant disciplinary issues," Ward has stricter rules than other FWCS schools. *Id.* ¶ 3. For example, Ward's students may not drive themselves to and from school (as opposed to taking a school bus) except under special circumstances, after submitting an application to and receiving approval from the administrative staff. In the administration's experience with students at Ward, "cars and illicit activity – particularly drug activity – go together," and this rule seeks to combat that issue. [Pruitt Decl. ¶ 11] If granted permission to drive, students must park in the school parking lot. In addition, students may never transport one another to and from school, and may not congregate in or around each other's vehicles at any time. According to the administration, riding together in cars increases the likelihood that students will engage in illegal conduct and drug use. [Pruitt Decl. ¶ 11]

Ward's official policies allow for student searches based on individualized suspicion of wrongdoing. If the staff approves a student's request to drive, the school's handbook warns students:

> Any vehicle parked on school grounds or driven without the administration's approval *and parked elsewhere* is still subject to search in accordance with the FWCS search and seizure policy providing that the administration has reasonable suspicion to believe an unethical or illegal act may have taken place in or by using said vehicle.

[Ward Handbook at 12-13] (emphasis added). As a part of the FWCS system, Ward's students must also comply with the FWCS-wide rules, *id.* at 6, which further state that "[a]uthorized school personnel may conduct a search of a student … automobile, if they have reasonable suspicion for a search." [FWCS Handbook at 32] According to FWCS, a search conducted under "reasonable suspicion" includes a search of a particular item that will lead to the discovery of "[a]nything that represents a danger of physical harm or illness to students, teachers, assistants or others, whether on school property, at a school-sponsored or school-supervised event *or otherwise*." *Id.* (emphasis added).

*Plaintiff's Path to Ward*

Kissinger and his parents agreed for him to attend Ward rather than face expulsion from his traditional FWCS school, Snider High, for possessing drugs. [Pruitt Decl. ¶¶ 5-6, Exh. 3] In May 2015, while at Snider, Kissinger told a fellow student that he had smoked marijuana. *Id.* This led to a search of Kissinger's vehicle, where a school administrator and a police officer found cigarette butts, prescription medication, acetaminophen pills, two knives, and marijuana. *Id.*

Kissinger had previously faced drug-related disciplinary action at Snider, including a 2013 suspension for possession of marijuana. [Pruitt Decl. ¶ 7, Exh. 4] According to the

corresponding report, Kissinger smelled of marijuana at school. *Id.* He admitted to smoking marijuana two weeks prior, and a subsequent search of his locker produced "shake."[1] *Id.*

*Plaintiff's Time at Ward in August 2015*

Kissinger enrolled for the 2015-2016 academic year at Ward, which began on or around August 15, 2015. Before the school year started, Kissinger and his mother requested that he be allowed to attend Ward for half days so that he could work the other half. They also requested that Kissinger be allowed to drive to and from school, so that he could leave straight for work after class. Ward's principal of nearly ten years, Mr. Pruitt, approved this request, conditioned on Kissinger turning in the required application and documentation of his work schedule, and that he follow all of Ward's driving-related rules as discussed above.

Kissinger and his mother agreed to these terms, but he did not live up to his end of the agreement. During the first two weeks of class, Kissinger: drove to and from school on several occasions without turning in his application, despite several reminders; did not park in the school parking lot despite multiple, explicit instructions from Ward's administration; and repeatedly drove other students to and from Ward, including during the times he represented to the administration that he would be at work. The administration finally informed Kissinger that, if he did not submit the necessary application by August 26, 2015, then he would not be allowed to drive to school and would be placed back on full class days.

*The Search*

Kissinger drove himself and another student to Ward on August 26, 2015. He parked on Weibke Street, about one block away from Ward's campus. The administration questioned Kissinger as to why he had not turned in his application and whether he had driven another

---

[1] "Shake" refers to remnants of marijuana leaves, stems, and seeds.

student to school that day. He provided untruthful responses. For example, Kissinger denied knowing where he was supposed to park, despite having previously been explicitly shown by Mr. Armstead. He also denied driving another student to school that morning, which was false. Based on Kissinger's evasiveness and several other factors, Mr. Pruitt suspected that Kissinger had contraband (specifically, drugs) in his car and ordered a search. Kissinger led a school administrator, Mr. Armstead, and the school resource officer, Officer Pruser, to his off campus vehicle. While Kissinger and Officer Pruser stood by, Mr. Armstead searched the vehicle and found a marijuana pipe containing burnt marijuana residue. Kissinger, Mr. Armstead, and Officer Pruser all returned to the school, where Officer Pruser handcuffed Kissinger and placed him under arrest.

## DISCUSSION

Kissinger argues that FWCS maintains an unconstitutional search policy, in violation of the Fourth Amendment's protection against unreasonable searches and seizures, because the policy allows for the search of student vehicles parked off campus and "not involved in a school-sponsored activity." [DE 49 at 3] He likewise argues that Pruitt, Armstead, and Pruser subjected him to an unreasonable search and seizure when they searched his off campus vehicle for contraband. Finally, he contends that the individual defendants committed false arrest and false imprisonment at the scene of the search and in placing him under arrest, and that FWCS and the City can both be held liable for these Indiana state law torts under the doctrine of *respondeat superior*.

1.	**Federal Claims**

Kissinger asserts federal claims against FWCS and the individual defendants under 42

U.S.C. § 1983, which creates a cause of action against any person who, while acting under color

of law, violates an individual's constitutional rights.

a.	**Kissinger's As-Applied Challenge to FWCS's Policy**

Kissinger challenges the constitutionality of the FWCS search policy as applied to him.[2]

"An as-applied challenge is one that charges an act is unconstitutional as applied to a plaintiff's

specific activities even though it may be capable of valid application to others. *Surita v. Hyde*,

665 F.3d 860, 875 (7th Cir. 2011). A plaintiff generally cannot prevail on an as-applied

challenge without showing that the law has in fact been unconstitutionally applied *as to him*.

*McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2016). When confronted with an as-applied

challenge, the Court must examine the facts of the case before it exclusively, and not any set of

hypothetical facts under which the statute might be unconstitutional. *Hegwood v. City of Eau*

*Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (citing *United States v. Phillips*, 645 F.3d 859, 863

(7th Cir. 2011)).

---

[2] While Kissinger's complaint did not provide specifics, he confirmed in his brief that he brings an as-applied challenge to FWCS's policy [DE 49 at 20], as opposed to a facial challenge. In contrast to a case-specific as-applied challenge, a facial challenge contends that a regulation or section thereof cannot be constitutionally applied to any set of facts. *MDK, Inc. v. Village of Grafton*, 345 S. Supp. 2d 952, 959-60 (E.D. Wisc. 2004). But regardless of what Kissinger wrote in his complaint, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331 (2010). "Rather, 'it goes to the breadth of the remedy employed by the Court': a facial challenge usually invites prospective relief, such as an injunction, whereas an as-applied challenge invites narrower, retrospective relief, such as damages." *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016) (quoting *id.*). And here, Kissinger seeks damages.

The school officials here conducted the search pursuant to Ward's policy that "[a]ny vehicle … driven without the administration's approval and parked [off school grounds] is still subject to search." As discussed below, under the facts of this case, the search of Kissinger's car was based on reasonable suspicion that it contained drugs and was permissible in scope. Therefore, the FWCS search policy is constitutional as applied to the circumstances of Kissinger's case and the Court will grant summary judgment in favor of FWCS on Kissinger's policy claim.

**b. The Fourth Amendment in Schools**

The Fourth Amendment's prohibition of unreasonable searches and seizures applies to searches conducted by school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). The Supreme Court in *T.L.O.* made clear that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 342. Determining the reasonableness of any search, including that of a student, requires a twofold inquiry: (1) whether the action was justified at its inception; and (2) whether the search as actually conducted was reasonably related in scope to the circumstances justifying the interference in the first place. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). A search of a student will be "justified at its inception" when reasonable grounds exist for suspecting that the search "will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 342; *see also Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149 (7th Cir. 1997) (citing and interpreting *T.L.O.*). When justified at its inception, a search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

The "reasonableness" inquiry, when applied to Fourth Amendment rights, "cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 656 (1995).[3] Importantly, "*T.L.O.* did not deny, but indeed emphasized, that the nature of [the state's power over schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 655.[4] While students do not surrender their constitutional rights "at the schoolhouse gate, … the nature of those rights is what is appropriate for children *in school*." *Id.* at 655-56 (citations omitted and emphasis added). And so, the reasonableness of the search is assessed mindful of the fact that the subjects of Ward's policies are: "(1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Id.* at 654.

This Court has previously held that a search of a student's vehicle parked *on* school grounds satisfies the Fourth Amendment, provided the search meets *T.L.O.*'s criteria. *See Anders ex rel. Anders v. Fort Wayne Cmty. Schs.*, 124 F. Supp. 2d 618 (N.D. Ind. 2000) (pattern of students smoking in school parking lot combined with plaintiff's behavior provided reasonable

---

[3] The FWCS defendants seek to apply *Vernonia*'s three factors for determining reasonableness [DE 48 at 15-16, 20-22], but those elements analyze the reasonableness of suspicionless search policies (those *not* based on an individualized suspicion of wrongdoing), unlike the policy here. *See generally*, 515 U.S. 646.

[4] For many purposes, school officials act *in loco parentis* "with the power and indeed the duty to inculcate the habits and manners of civility." *Vernonia*, 515 U.S. at 655 (citations omitted). As described by the Supreme Court:

> When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them. In fact, the tutor or schoolmaster is the very prototype of that status. As Blackstone describes it, a parent "may … delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed." 1 W. Blackstone, Commentaries on the Laws of England 441 (1769).

*Id.* at 654-55.

suspicion for officer to search plaintiff's car for contraband). Other courts have further allowed

school officials to search students while off campus at school-sponsored events, field trips,

sporting events, etc. *See, e.g.*, *Ziegler v. Martin Cnty. Sch. Dist.*, 831 F.3d 1309 (11th Cir. 2016)

(affirming reasonableness of resource officer's search of a party bus for alcohol prior to

admitting students to off campus prom); *Rhodes v. Guarricino*, 54 F. Supp. 2d 186 (S.D.N.Y.

1999) (search of students' hotel rooms on field trip did not violate Fourth Amendment). The

body of applicable caselaw does not, however, explicitly address, let alone prohibit the search of

a student's property located just off campus while the student is committed to the tutelary and

custodial care of school officials.

Kissinger argues that because no federal case has broadly held that "school officials have

legal authority to actually search a student or her property not located on school grounds and not

involved in a school-sponsored activity," then no such authority can ever exist. [DE 49 at 13] He

provides several state court cases in support of this argument. *Id.* However, these cases contain

distinguishable facts or interpret state statutes.[5] For example, in *J.P. ex rel. A.P. v. Millard*

*Public Schools*, on which Kissinger relies, the Nebraska Supreme Court reviewed a student's

suspension under the state's Student Discipline Act where the lower court found that the search

of his off campus truck violated the Fourth Amendment. 830 N.W.2d 453 (Neb. 2013). The

Student Discipline Act only granted disciplinary authority for possession of controlled

---

[5] *See Commonwealth v. Williams*, 749 A.2d 957 (Pa. Super. Ct. 2000) (interpreting state statute and declining to address waived Fourth Amendment arguments); *State v. Crystal*, 24 P.3d 771 (N.M. Ct. App. 2000) (principal's seizure of students off school grounds and outside school hours violated Fourth Amendment in the absence of state statutory authority and evidence of illegality or wrongdoing); *Packer v. Bd. of Educ. of Town of Thomaston*, 717 A.2d 117 (Conn. 1998) (addressing school board's authority to expel student who was arrested after a traffic stop unrelated to school); *Galveston Indep. Sch. Dist. v. Boothe*, 590 S.W.2d 553 (Tex. Ct. Civ. App. 1979) (addressing school board's statutory power to expel student and not involving any Fourth Amendment issues).

substances on school property, at a school-sponsored activity or athletic event, or in a vehicle owned or used by the school. *Id.* at 464. The student's truck in *Millard* did not fall into any of these categories, and so the court held that school officials did not have statutory authority to search the truck. The authority to discipline under the Student Disciplinary Act likewise limited the scope of any search. In contrast, the Defendants here face no such statutory limits to their authority to search student property; only *T.L.O.* and the Fourth Amendment govern their conduct.

The *Millard* court further relied on the fact that school authorities had no grounds for suspecting that the student had drugs in his car. *Id.* at 467-68. School officials in *Millard* grew generally suspicious of a student who briefly went to his car, without a required pass, to retrieve his wallet and sweatshirt. *Id.* at 457. Officials searched his person, backpack, and wallet, but found nothing. *Id.*[6] They went one step further, however, and searched his vehicle parked across the street, revealing drug paraphernalia. *Id.* The instant matter does not involve such a lack of reasonable suspicion and is factually distinguishable. *Millard* did not take place at an alternative school that had a policy prohibiting students from driving to school or parking off campus because they had a history of disciplinary issues, including drug possession. Nor did Millard involve a student with a known history of storing marijuana and knives in his vehicle.

---

[6] The search should have stopped there, and *Millard* aptly notes that the school officials lacked the necessary connection between student and drugs to form reasonable suspicion that the student possessed contraband. 830 N.W.2d at 464. However, for the reasons stated in this Order, the Court respectfully disagrees with *Millard*'s interpretation of *T.L.O.*, particularly with the implication that *T.L.O.*'s applicability ends abruptly at the school's physical boundaries. Indeed, school officials cannot "search a student's vehicle parked off campus *whenever* … the school [has] reasonable suspicion that a search would show the student had violated the law," 830 N.W.2d at 464 (emphasis added), but that does not mean that school officials may *never* conduct such a search. *T.L.O.* makes clear that "a search of a student should depend simply on the reasonableness, under *all the circumstances*, of the search," which include its location. 469 U.S. at 341 (emphasis added). Nothing in *T.L.O.* expressly bars school officials from searching student property located just off school grounds.

Kissinger focuses purely on the physical location of the search as determinative of its constitutionality, but in doing so overlooks *T.L.O.*'s overarching instruction that the reasonableness of a search "depends on the context within which the search takes place." 469 U.S. at 337. Moreover, he makes no effort to explain *why* a student search connected with an off campus school-sponsored event should warrant any different constitutional analysis than the present situation. *See Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1080 n. 15 (5th Cir. 1995) (addressing seizure of a student on a field trip while "reject[ing] the suggestion that the location of this seizure heightens the otherwise relaxed fourth amendment standards applicable to school searches and seizures."); *see also Rhodes*, 54 F. Supp. 2d at 192 ("[T]he mere setting of the search does not erase the well-established constitutional standard for searches of students and replace it with the more stringent probable cause standard, nor does it erase the *T.L.O.* standard. Instead, the setting of the search should merely be one of the many factors used in assessing the reasonableness of the search …."). Kissinger's narrow, geographically based argument presents a problem because the whole rationale for allowing school officials to conduct off campus searches of students at school-sponsored classes or activities is to maintain the same custodial care over the children that they have over them while *in* school. *See Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002) ("[T]he school decision-makers … still had the same obligation to protect the alternative students from harm and insure a conducive learning environment despite the off-campus setting."). "The schools' custodial and tutelary responsibility" for the students entrusted to their care, and not school boundary lines, drives the Fourth Amendment's less onerous reasonableness inquiry in the public school setting. *Id.* at 1059, 1061 (quoting *Vernonia*, 515 U.S. at 656).

Therefore, even in the absence of some school-sponsored event, the warrantless search of a student's property located off campus by school officials may be valid provided that the search meets the parameters of *T.L.O.* The physical location of the property in relation to school grounds is but a factor to be considered in measuring reasonable suspicion under *T.L.O.* – it is not determinative by itself.

### c. The Search

Kissinger claims that Mr. Pruitt, Mr. Armstead, and Officer Pruser subjected him to an unconstitutional search and seizure in violation of the Fourth Amendment when they searched his off campus vehicle. However, when taking all the circumstances and context of the present record into account, the search of Kissinger's vehicle was both justified at its inception and reasonably related in scope to the objectives of the search. *T.L.O.*, 469 U.S. at 333.

### i. *The search was justified at its inception.*

As stated above, for a student search to be reasonable, it must first be "justified at its inception," meaning that reasonable grounds exist for suspecting that the search "will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 342. Per Ward's policy, school employees will not conduct a search of a student vehicle parked off campus unless "the administration has reasonable suspicion to believe an unethical or illegal act may have taken place in or by using said vehicle." [Ward Handbook at 12-13]

When reviewing the search in context, as *T.L.O.* requires, recall that Ward is not a run-of-the-mill public school; it is an alternative school that provides an outlet for students to continue their education within FWCS rather than face expulsion for various rule infractions, such as weapons, fighting, and, most commonly, drug violations. Based on the administration's

13

experience, many of Ward's students use drugs. Furthermore, to avoid detection, students are more likely to use and possess illegal drugs in and around their cars. The risk of drug use only increases when students ride together in cars. So, in order to prevent drugs from compromising the safety of its learning environment, Ward maintains strict rules prohibiting students from driving to school (absent special circumstances), parking off campus, and giving other students rides to and from school. Public schools have a substantial interest in maintaining a productive learning environment and the security of their students through order and discipline, *T.L.O.*, 469 U.S. at 339, and Ward's status as an alternative school only heightens that interest. *See Pendleton v. Fassett*, No. 08-227-C, 2009 WL 2849542, at *5 (W.D. Ky. Sept. 1, 2009); *C.N.H. v. State*, 927 So. 2d 1, 4 (Fla. Dist. Ct. App. 2006) ("[A]lternative schools have an even greater need to maintain discipline and safety for the protection of students and staff, and create a healthy learning environment, than regular public schools based on the nature of their student population.").

In the two weeks leading up to the search, Ward's administration observed Kissinger repeatedly driving students to and from school, in violation of Ward's driving rules – rules the school employs specifically aimed at preventing students from using drugs. On the day of the search, Kissinger violated this rule yet again by driving another student to school in his car. He parked off campus, also a violation. When confronted by Ward's administration about these violations, Kissinger lied about driving another student and feigned ignorance regarding where he was supposed to park. At that point, Mr. Pruitt suspected that Kissinger had contraband in his vehicle. Mr. Pruitt based his suspicion on the following factors:

- Mr. Pruitt knew of Kissinger's documented history of bringing drugs to school – he had twice been disciplined for possession of marijuana at Snider High;

- In the most recent drug-related incident at Snider, only three months earlier, marijuana and knives had been found in Kissinger's vehicle;

- In his nearly ten years of experience as Ward's principal, Mr. Pruitt knew that many of the school's students use drugs;

- Based on his experience, Mr. Pruitt knew that Ward's students' drug use is often connected to their vehicles and that those issues only worsen when students ride together in vehicles. On that day, Kissinger used his vehicle to transport another student;

- Kissinger lied about the fact that he drove another student to school that day and denied knowing where to park, suggesting that he had something to hide; and

- The fact that Kissinger chose a more inconvenient place to park – off campus, in violation of Ward's rules, and against explicit instructions to park on school grounds – further suggested that he had something to hide in connection with his vehicle.

[Pruitt Decl. ¶ 21] A search is warranted if "the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated." *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) (affirming strip search of student where relatively recent drug-related incidents reported by teachers and aides supported reasonable suspicion that search would reveal student's possession of drugs). Kissinger's drug-related disciplinary history, the reasonable inferences drawn from his repeated violations of the school's driving rules, and evasiveness in explaining his conduct all support a finding that Ward's administration had reasonable grounds to suspect that a search of Kissinger's vehicle would reveal possession of illegal drugs. *See Bridgman*, 128 F.3d 1146 (affirming summary judgment in favor of school district where school staff conducted "medical assessment" of student and searched his person for drugs; student had been caught smoking cigarettes on two previous occasions, behaved in an "unruly" manner, and had bloodshot eyes); *Morgan v. Snider High Sch.*, No. 1:06-CV-337, 2007 WL 3124524 (N.D. Ind. Oct. 23, 2007) (reasonable suspicion supported search of student's car

for contraband where student admitted to driving a schoolmate onto school property who was found to be under the influence of and possessing marijuana).

But for the physical location of Kissinger's car and the fact that he attended an alternative school, his case presents a notably similar scenario to that in *Anders*, 124 F. Supp. 2d 618. In *Anders*, much like the propensity of Ward's students to use their vehicles for drugs, school administrators received ongoing complaints about students smoking in the school's parking lot. *Id.* at 620. While monitoring the parking lot, the school's resource officer, a nine-year veteran of the Fort Wayne police force, noticed the plaintiff student walking briskly through the lot toward the school. *Id.* The officer suspected that the student had been smoking in his vehicle (located in the school parking lot), against school regulations, because: he had not seen the student exit the building; he learned that the student did not have a pass to visit the parking lot, in violation of school rules; the student tried to avoid detection and questioning by the officer; and the student offered a hollow excuse for going to his car. *Id.* at 620-21. The resulting search of the student's vehicle yielded cigarettes, lighters, and knives, and this Court found the search to be "justified at its inception" because the totality of the circumstances created a reasonable suspicion of a rule violation (smoking) for the officer to search the car for evidence. *Id.* at 622-24.

As in *Anders*, Kissinger created a reasonable suspicion that he had contraband in his car when he blatantly and repeatedly violated the school's driving policies even after receiving multiple instructions on where to park and several warnings not to drive other students to and from school. That Kissinger would park in a less convenient location to school and repeatedly violate the driving/parking policy, without explanation, suggests an improper motive for doing so. Upon being questioned by the experienced administration, he gave evasive and less than forthcoming answers, further increasing that suspicion. When placed in the context of Ward's

stricter environment, its student's use of vehicles as cover for drugs, and Kissinger's own recent drug-related disciplinary history, reasonable suspicion existed to justify the administration's search of Kissinger's vehicle for contraband "at [the search's] inception" under *T.L.O.*'s framework.

### ii.    *The search was reasonable in scope.*

Even if a student search is justified at its inception, the search must be reasonable in its scope. *T.L.O.*, 469 U.S. at 342. In other words, the search measures adopted must reasonably relate to the objectives of the search and not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

In *T.L.O.*, the Supreme Court determined that the search of a student's purse was reasonably related to her being suspected of smoking in the school bathroom. *See generally*, 469 U.S. 325. Here, Mr. Pruitt specifically suspected that Kissinger had contraband in his car. [Pruitt Decl. ¶ 21] Each of the factors that aroused Mr. Pruitt's suspicion had a connection with Kissinger's vehicle. *See Anders*, 124 F. Supp. 2d at 625-626. Upon arriving at Kissinger's car, the record indicates that Mr. Armstead limited his search to the vehicle's interior [Dep. of Donald Kissinger, Jr. 74:25-75:12]; no defendant ever extended the search beyond the suspected location of contraband, such as by searching Kissinger's person. *See Bridgman*, 128 F.3d at 1149 (affirming district court's finding that medical assessment and search of student's outer clothing did not excessively intrude where student's behavior and physical symptoms could have indicated drug use). Moreover, the administration did not conduct any additional search after finding the contraband.

Kissinger advocates for a hardline prohibition against searching any student property located off campus, but such a holding would conflict with *T.L.O.*'s instruction to view each

search in light of the circumstances present and would violate common sense. Kissinger's proposal could lead to frustrating and dangerous real-life results. Students could avoid school searches by merely parking across the street from school property, giving them quick and unfettered access to all sorts of contraband. Moreover, such a parking location might actually be closer in proximity to the school than a designated parking lot on school grounds lying beyond athletic fields or other school facilities. Under Kissinger's interpretation of the law, a search of the vehicle parked across the street would always require a warrant based on probable cause – a requirement, that, in certain circumstances, interferes with school officials' crucial ability to maintain the "swift and informal disciplinary procedures needed in schools." *T.L.O.*, 469 U.S. at 340.

Here, Kissinger's vehicle was merely a block away from school property. It was still readily accessible to him or other students during the school day. Such potential access to drugs and/or weapons is a realistic and valid concern for school administrators as it causes a viable danger to student safety and welfare. Given that, and the heightened risk established by Kissinger's two recent reprimands for possessing marijuana and *knives* in his car, the Court finds that the individual defendants appropriately limited the scope of their search, and thus did not violate Kissinger's Fourth Amendment protection against unreasonable searches and seizures. *Id.* at 341.

Kissinger notes that the administration did not know the location of Kissinger's car when Mr. Pruitt ordered the search. [DE 49 at 17] True, but the Court must address the reasonableness of the search itself, not the order to search. Ward's administrators knew Kissinger parked only a short block away from campus by the time they reached the car and before they began the search itself. Had Kissinger parked so far away as to render any search unreasonable, the administration

could have made that determination and aborted the plan to search Kissinger's car. The Court recognizes that the appropriate scope of a search is impacted by the vehicle's proximity to the school, and it is not the Court's intent to suggest that a potential threat to the school's security alone justifies an unreasonable expansion of the search area. Rather, in keeping with *T.L.O.*, this ruling is limited to the particular circumstances of *this* case, which include the relatively close proximity of the vehicle to the school's campus.

### d.  Qualified Immunity for the Individual Defendants

Whether government officials enjoy qualified immunity involves a two-part inquiry. The first question is whether, taking the facts in the light most favorable to the plaintiff, the individual defendants' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)). Here, it did not, and so the individual defendants are entitled to qualified immunity. But, even if the individual defendants had subjected Kissinger to an unreasonable search and seizure, they nonetheless enjoy the protection of qualified immunity because their search of Kissinger's vehicle did not violate a clearly established constitutional right. *See id*.

Kissinger bears the burden of establishing that the constitutional right at issue was clearly established at the time of the search. *See Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (citing *Kroger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008) (a plaintiff seeking to defeat an assertion of qualified immunity must establish "that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred.") (internal quotations omitted); *Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'; however, an official action is not

protected by qualified immunity only when the very action in question has previously been held unlawful, rather the unlawfulness must be apparent 'in light of the pre-existing law.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "A violation may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, *or* if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000)) (emphasis added).

"The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (emphasis in original). The Seventh Circuit has long held that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987); *see also Baird v. Bd. of Educ. For Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 696 (7th Cir. 2004) ("Our inquiry is defined by whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting *Saucier*, 533 U.S. at 202).

Here, Kissinger has not introduced closely analogous cases establishing that the search of his vehicle violated his Fourth Amendment rights, despite his burden to do so. "When looking at closely analogous cases to determine if a right was clearly established at the time of the violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Bender*, 600 F.3d at 781. There is no controlling precedent available; *T.L.O.* established a baseline allowing searches of students in school, but the Seventh Circuit and Supreme Court have yet to define the limits of school administrators' authority to search student property located off campus. So, "[i]n the absence of controlling precedent, we must broaden our survey to include all relevant case law in order to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Jacobs v. City of Chi.*, 215 F.3d 758, 766 (7th Cir. 2000)). Kissinger points to the Supreme Court's decision in *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009), in support of his argument that a reasonable official should have known that the search of Kissinger's vehicle was excessive, unreasonable, and unjustified at its inception. However, *Redding* provides little notice to the school officials here because that case involved the strip search of a student at school. *See id.* Kissinger's only other support comes from the non-Indiana state cases discussed herein, but none of those cases apply. As distinguished in this opinion, those cases all involve inapplicable factual scenarios and hinge on state law, not the Fourth Amendment. Thus, Kissinger has failed to carry his burden to provide the Court with contextual evidence that searching a student's off campus property violates clearly established law.

In short, even when the facts are viewed in the light most favorable to him, Kissinger has not shown that the individual defendants violated a clearly established constitutional right. Even

if reasonable jurists could differ over whether or not their conduct amounted to a violation of the Fourth Amendment at all, it would be difficult to say that the violation "is so obvious that a reasonable state actor would know that what they are doing violates the Constitution." *Siebert*, 256 F.3d at 654-55. An objectively reasonable state actor, observing the undisputed events at the center of this case, simply would not have known that the search of a student's vehicle parked one short block away from the school would violate his constitutional rights. As a result, the individual defendants here are entitled to qualified immunity.

## 2.     State Law Claims

Kissinger's state law claims for false arrest and false imprisonment will be dismissed without prejudice. The supplemental jurisdiction statute provides that the district court "may decline to exercise supplemental jurisdiction" over state-law claims if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Although the decision is discretionary, '[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims.'" *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (quoting *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010)). This presumption may be displaced only in certain circumstances, namely when:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* (citing *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009)).

Here, Kissinger will not be time-barred from refiling his state law claims in state court. Under Indiana law, depending on who or what entity he brings these claims against, either a two-

year or five-year statute of limitations governs Kissinger's tort claims. Ind. Code §§ 34-11-2-4(a), 34-11-2-6. Tort claims accrue and the statute of limitations begins to run when the plaintiff discovers, or in the exercise of ordinary diligence, could discover, that he has sustained an injury caused by another person's tortious act. *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992). At the very earliest, Kissinger's claims for false arrest and false imprisonment accrued on August 26, 2015, the day of the search and his arrest. He filed theses tort claims, originally through his father as next friend, on April 13, 2016.[7] [DE 1] The supplemental jurisdiction statute tolls the period of limitations for supplemental state law claims while pending in federal court for a period of thirty days from when the court dismisses them, unless state law provides for a longer tolling period. 28 U.S.C. § 1367(d); *Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018). Kissinger timely filed his tort claims with this Court, and he will have ample time to refile them in state court should he choose to do so.

When considering any judicial resources expended, this case has remained relatively quiet considering that the instant motions for summary judgment represent the only dispositive motions filed in this matter to date. *Cf. Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722 (7th Cir. 2001) (considering protracted nature of case and substantive orders in reversing district court's decision to relinquish supplemental jurisdiction over state law claims). Even still, "[e]valuating considerations of judicial efficiency and duplication of judicial effort is not just a matter of toting up months or motions or the page counts of judicial orders." *RWJ Mgmt.*, 672 F.3d at 481. Instead, "concerns about judicial economy have their greatest force

---

[7] Upon reaching the age of majority, Kissinger submitted an amended complaint to remove his father from the litigation and to name Officer Pruser as a defendant. [DE 29] Whether his amended complaint relates back to the date he filed his original complaint has no bearing on whether the Court should retain jurisdiction over his tort claims. The Court entered the amended complaint on the docket (after granting Kissinger's motion to amend), on August 26, 2016, still shy of Indiana's applicable statutes of limitations.

when significant federal judicial resources have already been expended to decide the state claims, or when there is no doubt about how those claims should be decided." *Id.* (citing *Dargis v. Sheahan*, 526 F.3d 981, 990-91 (7th Cir. 2008); *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).

Here, in reaching summary judgment on Kissinger's § 1983 claims, the Court has not decided any dispositive issues relating to his claims for false arrest and false imprisonment. *See Shackleford v. D&W Fine Pack, LLC*, No. 1:15-CV-282, 2017 WL 371627, at *5 (N.D. Ind. Jan. 25, 2017) (relinquishing jurisdiction over the plaintiff's pendant supplemental claims where, in deciding the plaintiffs federal claim, the court did not decide an issue dispositive of the state law tort). For these reasons, the Court will dismiss Kissinger's claims for false arrest and false imprisonment, without prejudice.

## CONCLUSION

The Court is not holding against precedent, nor does it suggest that any time a student vehicle is parked off campus it is subject to search by public school officials. But, when applying the *T.L.O.* standard to the facts of Kissinger's case, the search of Kissinger's car was justified at its inception and reasonable in scope. Therefore, the Court hereby **GRANTS** Defendants' motions for summary judgment [DE 45; DE 47] with respect to Plaintiff's Fourth Amendment claims. Pursuant to Plaintiff's filing [DE 49 at 1], the Court also **DISMISSES** Plaintiff's claims brought under 42 U.S.C. §§ 1985(3), 1986, and the Fourteenth Amendment, with prejudice. Furthermore, the Court **DISMISSES** Plaintiff's state law claims, without prejudice. Lastly, the Court **DENIES** Defendants' motions to strike [DE 51; DE 54] as moot. As this Order disposes of all Plaintiff's claims against all Defendants, the Clerk is hereby **DIRECTED** to enter judgment.

SO ORDERED.

ENTERED:  February 26, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court